The next and final case for this morning is Corcoran v. OMP, 24-2349. Ms. Lopez, Counselor Lopez, you have reserved four minutes of time for rebuttal. Yes, thank you, Your Honor. You may proceed. Thank you. Good morning, and may it please the Court. This appeal really boils down to one very narrow question. Did my client, Sarah Corcoran, establish by preponderant evidence that she and her husband, Tony, mutually agreed to be permanent spousal-like partners during the period in question such that they are common-law married under the law of Washington, D.C.? What's the legal question you're bringing to us? The legal question is twofold. Number one is whether the government, whether the OPM and MSPB's decision was contrary to law or unsupported by substantial evidence. Those are the two questions that we have submitted to Your Honors. Now, without dispute, the government credited Sarah's unrebutted testimony and all the other evidence, documentary and otherwise, that she and Tony referred to each other in the present tense as husband and wife, and that they were, quote, in an existing commitment prior to their civil ceremony in May 2020. Now, despite crediting this evidence, the administrative law judge found as a matter of fact, without any evidence to back it up, that Sarah and Tony did not refer to each other as husband and wife in the solemn sense, but, quote... So you're not asking us to go by piece by piece of the evidence that the administrative law judge considered and to review that. Is that right? Correct. We're not asking for a de novo review. I don't think that's appropriate. The standard on appeal is contrary to law or unsupported by substantial evidence. So the quote was, terms of endearment is how the judge perceived those very solemn words, husband and wife. We submit that this was error under Supreme Court precedent, Bose and Moore, and as a matter of D.C. law. To remind Your Honors, we cited these cases in our opening brief and reply brief. The Bose and Moore cases stand for the proposition that a fact finder may not use the disbelief of testimony as the sole basis for finding that the opposite is true. And to put that in some other words, a witness's testimony, if it's not believed, the fact finder may simply disregard it, but the discredited testimony is not considered a sufficient basis for drawing the contrary conclusion. Counsel, do you agree that Ms. Corcoran did not file taxes jointly until after they were ceremonially married? Yes, we do concede that. The government doesn't dispute the Supreme Court precedent and points to no evidence, because there was none, that terms of endearment was the way that they were using husband and wife. And under D.C. law, they would have had to have submitted such evidence because D.C. courts do not consider those terms to be terms of endearment. Under D.C. law, as we submitted in our briefs, they actually are considered as evidence of entering into a common law marriage. This makes complete sense, Your Honor, because, Your Honors. What is your best case that supports your claim for common law marriage here in D.C.? So we would submit that the Cleary v. Cleary case, which was decided in 2024, supports our case because of the very simple conversation, keeping in mind that it's a particularly lenient standard under Washington, D.C. law, which Cleary repeatedly, or repeated, and that there is no set formula to establish common law marriage. In that case, common law marriage was actually established if the court credited it on remand. The following simple conversation, quote, let's be common law married, okay. Also, we would submit National Union Fire v. Britain supports our case because that minimalistic conversation in that case sufficed. Quote, he said he was my husband, and I said I was his wife, so I just figured we was married. That was enough under the particularly lenient standard in Washington, D.C. The Coates v. Watts case, admittedly, it's in a footnote, and it was not the forefront of the case because the court found that there were reasons why the common law marriage wasn't established as a matter of law. But the following conversation were pointed to as, quote, words of present agreement. She said I want you, and I want you to come and live with me, we as one, that we be as man and wife, and I said okay. The government doesn't confront those cases, by the way. It really focuses on the fact that the judge found Sarah's testimony to be inconsistent and vague. The conversations that Sarah testified to, we submit, were not vague. And in any event, the credited testimony, or at least didn't really address some of the salient facts where Sarah was not inconsistent. And I'm just going to quote a couple of those. Sarah testified, I know that we had a conversation, that we considered ourselves to be husband and wife. They agreed to be each other's partners for eternity. And she recounted some details about that, where she was talking about how her husband wanted to be an Egyptian pharaoh, and she his queen, in the sense that Egyptians in past lives had eternity. So your argument is that these statements that the judge found to be terms of endearment, that they don't amount to substantial evidence? We submit that the lack of substantial evidence was for the finding that they were terms of endearment. The other portion of our argument is that it was contrary to law, D.C. law. And I would submit one other portion of that is that the judge focused on the official ceremony in a way that we submit was error. It did exactly what the law does not allow it to do, which is using that official ceremony together with some tidbits of testimony to find that Sarah and Tony were only engaged before the civil ceremony. The Cerevich case is a case out of the D.C. Court of Appeals, and that case made clear that you cannot use... Which case is this? This is the Cerevich versus Stojkov. I'm probably murdering that pronunciation. A formal ceremony is not conclusive evidence that no common-law marriage existed in the time period before the civil ceremony. In fact, in that case, the court admonished judges to focus only on whether there was preponderant evidence that the parties mutually agreed, in present-tense words, to be permanent partners during that period in question. Ms. Melvin, let me ask you a question. In your brief and argument today, you do an excellent job of marshalling the evidence that supports your position in this case. On the other hand, the government marshals the evidence on its side. So, you know, it's up to the MSPB, at the end of the day, to make the decision. And, you know, it's a tough case, difficult case, but who is to step in and say that the MSPB decision isn't supported by substantial evidence? That's what is concerning me a bit. I understand Your Honor's point. And we do recognize that there was a finding by the judge that there was evidence of engagement. Sarah didn't run away from that. She actually addressed that in her testimony. She said, listen, I get that this is not the typical order that men go in to be committing to each other as husband and wife. Then there's an engagement ring and party. And then there's a civil ceremony. She said, she admitted this. And she said, this is part of the continuum that me and Tony were on. In their particular relationship. In their particular relationship. And again, that is one part of our argument, the non-substantial evidence. The other part of our argument is that this was contrary to law, DC law. Makes very clear that it's a lenient standard, no set formula. The use of the expressions husband and wife in common parlance. I mean, I can see a girlfriend calling a boyfriend sweetie husband, but husband? That's a very solemn term. And there's a reason why DC courts look at those terms and the usage in the present tense. Because they do carry legal weight. They carry meaning. And that's why they're looked at. I also wanted to focus, your honors, on one aspect of the testimony that I think the court below aired in giving short shrift. And that was the testimony of their auto mechanic, Marcus Bississier. He testified that Tony and Sarah introduced themselves to him as husband and wife. Do you have an appendix page you wanted to point us to? Yes. I was just looking for that in my notes, your honor. Well, I will find it for you on my rebuttal. And I'll give you that exact cite for it. But in the opinion, the judge gave it short shrift and said, that should be given less weight, because it's in the context of a business transaction. We would submit that it should be given at least equal weight, if not more weight, because this was a completely disinterested witness. And it would be improbable that two people would introduce themselves as husband and wife to a service vendor if they had not mutually agreed to be in that kind of a relationship. So I will get that appendix cite for your honor. Before I sit down and let my colleague argue, I do want to make another point about the government's ruling, which is that it was, in our view, very schizophrenic. On the one hand, it found that the official ceremony and the out of context testimony about this engagement period demonstrated that Sarah and Tony were merely engaged. But on the other hand, it simultaneously held, quote, the couple may have seen marriage as a formality or confirmation of their existing commitment. And we would submit, having an existing commitment with a civil ceremony as a mere formality is exactly what common law marriage is. I'll reserve the rest of my time. Thank you, your honors. Thank you. Catherine Fleming. Good morning, your honors. May I please report? All right. Your honor, in this case, the plaintiff failed to demonstrate before the board that there was an express agreement, that the agreement was in the present sense, and that it was mutual. Those are all things required under DC law. And I would disagree with my colleague characterizing the requirements of that law as permissive. And in fact, requires an examination of all of these things. In fact, she has, in her briefs and just today, suggested that the use of the term husband and wife, or hubby and wifey, as was the case in many examples used here, is sufficient to demonstrate an intention to be common law married. But my colleague can identify no case in which those were the only facts that the DC circuit relied upon to find a common law marriage. And that's for good reason. Because it's not enough to find an express agreement. And we see that throughout the evidence that Ms. Corcoran has offered in this case. She, in fact, said, I cannot tell you this specific conversation. I can't speak of a specific detail I had from a conversation two to three years ago. But I know that we had the conversation that we consider ourselves husband and wife. The fact that she cannot identify that conversation distinguishes this case clearly from situations like Cleary, where the court expressly found, albeit indicating a genuine issue of material fact and not a conclusion that there was, in fact, a common law marriage, that the statement it relied upon was, let's be common law married and OK. We're going to do a thing. I agree. That is a conversation that Ms. Corcoran could not testify to in this case. And the fact that she can't. Let me ask you, I'm sorry to interrupt you in the middle of your flow of conscience there. But I did have one question. I didn't want to forget it myself. What is your answer to Ms. Lopez's argument that there were errors of law here, in particular her citation to the Supreme Court decision, the Bose case and all? In other words, I understand her saying there was an error of law here because the board disbelieved someone, but then used that disbelief to prove a positive fact in favor of the government. What's your response to that? Well, Judge Schall, my colleague, I believe is misinterpreting that case. In Bose, the court agreed that the witness testifying differently than the facts supported enabled them to conclude that it was false testimony. What the court declined to do was take the additional step of finding malice. No one's trying to prove an additional intent or mens rea here. No one in the record or before the board concluded that Ms. Corcoran had some sort of additional intent or mens rea that we used the disbelieved testimony to prove. Rather, this is the case where Ms. Corcoran's testimony was not credible when viewed in conjunction with the other testimony that she gave. The fact that you can look at prior and consistent testimony to assess credibility is well-established in the law. And this court in Haguey, I'm going to mispronounce that. I apologize. It looked at the Hillen decision that set out the factors for determining credibility and expressly found inconsistent testimony is one of those things. So the board wasn't trying to prove an additional fact. It was assessing the credibility of Ms. Corcoran's testimony, which changed during the course of her testimony before the board. And that's what makes it different. Bose does not apply, nor do the other two cases that Ms. Corcoran cited, which both also looked at the application of discredited testimony towards a mens rea element. Neither of those apply here, too. There simply is no legal error from that description. And likewise, as I mentioned, the fact that the board found insufficient the use of the terms husband and wife by the two purported members of the couple, the decision that was not enough is not sufficient to violate DC law. DC has never had a case in which the use of those terms was sufficient. In addition to the fact that she was vague in describing the conversation that she relies upon to show agreement or express agreement, the timing was also something that she could not identify. And this is critical because, of course, the whole point of common law marriage and the end of the third element requires that the couple show or the proponent show that, in fact, they had all the qualities of marriage, albeit not in a formal license that was approved by the state. One of those qualities, as I think most of us would agree, is that we tend to celebrate our anniversaries when we're married. Ms. Corcoran could not tell you what her wedding anniversary is because she does not know at what time the conversation she had with the plaintiff, or excuse me, with the decedent, occurred. So the fact that she can't tell us a time at which this conversation occurred is important. Next, she also conflates in her testimony, a fact that was noted by the board, conversations about her engagement, her pending ceremonial marriage, and what she attaches as her common law marriage conversations. And while we do not argue, nor did the board find, that the existence of a ceremonial marriage precludes a finding of a common law marriage, it can be instructive. And in fact, even in the case that my colleague just cited in Kovacic, I believe, the court expressly found that the intent to marry someone someday tends to show the opposite of that claim. And so again, it's not conclusive, nor did the board find that it was conclusive. But it certainly noted the fact that there was clearly an intention to go forward with both an engagement and a ceremonial marriage. That was an intention that was celebrated with Ms. Corcoran's friends. It was something they planned for. They had a party. Those were all steps taken that showed the value that the couple appeared to place on a ceremonial marriage. And so it tends to be in tension with the conclusion that there was a common law marriage already in place. But even if you didn't agree with that, the board still looked at the fact that Ms. Corcoran could not clearly delineate conversations that marked the engagement or the progress through its ceremonial marriage compared to those she relied upon for showing the common law marriage. And you can see this in the record. She testifies that the Bahrain diamond necklace was a symbol and a gift in furtherance of her agreement to be presently married. But then she later testifies also before the board that she became engaged with that diamond necklace. So she's using the same events or conversations to indicate both engagement and the present marriage. Those two things are not consistent. Further, the nature of the use of the endearments or the affilations in this case is not consistent with a common law marriage. For instance, Ms. Corcoran testified that shortly after she met her husband, she called him hubby. She referred to him as her husband. That is not consistent with her later testimony that it was quite some many months later that they were. Did they ever indicate in any type of correspondence or interaction with governmental agencies as Mr. and Mrs.? I don't believe that they do, Your Honor. In fact, as I believe the court asked my colleague about her tax returns, they did not file jointly. There's no indication that they were on property together. They didn't pay for each other's houses. They maintained separate residences. And there doesn't appear to have been any- They did pay for each other's car repairs. There seems to have been some gifts from Mr. Shinnella flowing to Ms. Corcoran's on specific occasions. I believe he also contributed some for medical expenses. That's on the record. But for instance, they didn't pay bills together. They didn't pay. They were on a mortgage together. Ms. Corcoran relies on National Union. In that case, there was an insurance policy that named the decedent as a spouse. There was a mortgage that showed them both on the mortgage. There was a landlady reporting that there was mail directed to the purported wife in her married name at their address. There was a lot of indicia legally that they had joined together as one entity. In this case- They lived in DC, right? They lived partially in DC. With Ms. Corcoran's mother? Your Honor, the record reflects that they lived in two different residences during the course of the period they ascribed to the common law marriage. They lived partially in Virginia and partially in DC.  So another example of a case where the agreement was more clear is a case that Ms. Corcoran relied upon, East v. East. In that case, again, at a dinner party, the statement that the court ultimately credited in support of the marriage was, from here on in, Margaret and I are married. Said to witnesses, the witnesses testified to that effect. There is no such testimony on the record here. Instead, what we see is a lot of conflicting testimony from the witnesses that Ms. Corcoran offered. And that testimony not only undermines the claims that she's made about the timing of her engagement in marriage, but they also suggest that there was a mutuality problem. You can't have an agreement between two parties unless it's mutual. And in this case, Ms. Anderson, Ms. Corcoran's mother, testified that even after the time period in which Ms. Corcoran claimed that they were common-law married, Mr. Shinnella asked her for her daughter's hand in marriage. It's not consistent. She also referred to Mr. Shinnella as her daughter's fiance, again, during the period when Ms. Corcoran is saying that they were married. She then recounted a conversation with Mr. Shinnella where he said he was prospectively, in the future, going to add her to the deed to his house. He didn't take the steps necessary to do that while they were common-law married. One can only assume that he was waiting for the ceremonial marriage. Likewise, the same situation with his will, which clearly vexed Ms. Anderson. Ms. Allen, whose testimony Ms. Corcoran also relied upon, testified that she had a conversation with Mr. Shinnella when he said prospectively, quote, he wanted to marry Sarah and was going to. This was a future event that was contemplated. It was not a present reality. The fact that Mr. Shinnella did not go forward with the legal paperwork necessary to add her to his will, or to join their bank accounts, or to join their finances, to join their residences, to join their taxes, all of these things tend to show that, at least for Mr. Shinnella, he did not consider themselves married in the sense that the common law would require. I would just, unless the court has further questions, I would just close here with the idea that there are a lot of ways that people can express and have intimate relationships with people that are not marriage. And one of the things that you risk when you go a common law route is that people won't agree with you that what your particular relationship included, in fact, was a marriage. They take that risk when they go that route and say, well, I'm not married. Instead of getting a formal ceremony from the court. And regrettably, there didn't seem to be a way to fix that for Mr. Corcoran now. So with that, we would ask that the court affirm the board's decision. Thank you. Your Honor, the testimony of the auto mechanic appears at Appendix 105 to 109.  In DC, common law marriage is alive and well. And the ending comment of my colleague shows kind of a predisposition against it. But it exists. It's allowed in DC. And there's a particularly lenient standard. A lot of the comments that were made by my colleague struck me as taking into account if you had a 10-year relationship. This was an 18-month relationship. And unfortunately, Tony killed himself a month after they got common law married. A couple of things, also, that I wanted to point out. A month after they were ceremonially married. After they were ceremonially married, yes, please. Thank you. Tony called Sarah, his wife, to her friend, their friend, Morgan, as well as their auto mechanic. So the fact that he referred to her as a fiance to the mother, we don't deny that fact. But there are other instances in this record that suggest that he absolutely thought that she and he had mutually consented to be in a different sort of relationship than an engagement prior to the civil sermon. There are other instances of facts in this record that support, besides just calling each other husband and wife, as you all touched on, the shared finances, discussions with friends, calling husband and wife and referring to each other in communications. You asked, Your Honor, about the government communications. Again, taking into account that this was an 18-month relationship, I think we're going to find less instances where they were referring to each other in government communications. However, there was an instance where Tony emailed Sarah, saying you're an authorized user as my wifey on a membership with the Army-Navy Club. So that does strike me as a situation where you wouldn't refer to somebody as wifey in an endearing sense. The Bowes case, my colleague tried to distinguish it on the facts. But we cite it for the legal tenant. We're not trying to say that the facts are apples to apples. Sarah absolutely testified that she knew the timing. She said, I'm going by seasons here. She admitted, I don't have details that I can share with you. I don't have an exact date. But she said it was cold and it was the winter. So she did have something that she could testify to as to timing. And in any event, the timing question is not the be-all and end-all, as the Gill case made clear. As I already told, Your Honors, Sarah did not hide from the fact that she had the engagement and the ring and the party and that these things may seem awkward to others. But she conceded that. She said, this was just part of the continuum that we were on. And frankly, there was nothing in the record to suggest that they had a big party after the ceremonial marriage. Counsel, just a housekeeping question. What period of time were they living together in DC versus Virginia? So it was shared time. It wasn't one and then the other. He had a house in Virginia. Her mother actually had a house in DC. So the fact that they didn't contribute together to the expenses of the DC house is irrelevant. Sarah didn't. This was owned by her mother. She lived in a lovely, as she put it in her testimony, a lovely, large wing of her mother's house in DC. And they would go back and forth between the two residences. So finally, I'd like to focus on the Gill case, which says that actions speak louder than words. You don't have to say, OK, we're common law married. That's very hyper-aware of perhaps some legal niceties that just normal people aren't aware of. But what the Gill case focused on was actions are louder than words. And we would submit that the actions here, in the 18 months they spent together, were very loud. And the way that they introduced each other, the way that they talked to each other, shows that they considered themselves to be permanent, lifelong partners in the spousal sense under the laws of DC. Thank you. Thank you. We thank the parties this morning for the arguments. And we now stand in recess.